PAT MARR, Respondent, *v.* JOSEPH P. TUMULTY and Another, as Receivers of the SOUTHERN STATES OIL CORPORATION and Others, and Another, Appellants, Impleaded with CHARLES N. HASKELL and Others, Defendants.

First Department, March 10, 1930.

*John J. Curtin* of counsel [*C. H. G. Heinfelden* and *Wesley S. Sawyer* with him on the brief; *John J. Curtin*, attorney for the receivers, appellants; *William R. Willcox*, attorney for the appellant Unity Securities Corporation], for the appellants.

*S. Lawrence Miller* of counsel [*Frueauff, Robinson & Sloan*, attorneys], for the respondent.

McAvoy, J. The action was brought in equity to rescind a contract whereunder plaintiff received 28,296 shares of stock of Southern States Oil Corporation in exchange for 157,691½ shares of stock of Marr Oil Corporation. The defendants Haskell, Ferris and McFadden have not been served with the summons as they are without the jurisdiction. None of them, although having knowledge of the suit, has appeared in the action.

The defendants Middle States Oil Corporation and Southern States Oil Corporation were two of the holding corporations in the so-called Haskell group of companies, and Unity Securities Corporation, Haskell's family corporation, was used by him to finance them and their subsidiaries. Haskell was chairman of the board of Southern States and Ferris was its president.

On and prior to August 30, 1923, the plaintiff was the owner of 25,000 shares of class A voting stock of Marr Oil Corporation, and 87,791.5 shares of class B non-voting stock thereof. The 25,000 shares of class A voting stock constituted the entire voting stock of Marr Oil Corporation, and, therefore, controlled it. The total outstanding stock on August 30, 1923, was a little less than 400,000 shares of no par value.

The Marr Oil Corporation had valuable holdings of oil producing property. Its leaseholds prior to August 30, 1923, had been carefully gone over by a firm of well-known engineers and appraised by them, and their report is in evidence. On August twentieth the average daily net production of the company was around 4,000 barrels per day and such production included both flush and settled. The properties were located principally in the State of Arkansas, and the company's office was in El Dorado, Ark.

The book value of the stock of the Marr Oil Corporation on August 20, 1923, was about thirteen dollars per share.

Louis T. McFadden became a director of the Marr Oil Corporation at the time of its incorporation, and continued as a director and chairman of the board to August 30, 1923. Upon the incorporation of the Marr Oil Corporation he owned a one-half interest in a lease which was acquired by the corporation, and class B stock to the extent of 11,000 shares was issued to him for such interest. Subsequently the plaintiff gave him 10,000 additional shares of class B stock which he owned in August, 1923. Rottenberg was a director in the Marr Oil Corporation from its inception, and was the owner of 10,000 shares of class B stock thereof, which shares had been given to him by the plaintiff. The plaintiff reposed trust and confidence in McFadden and Rottenberg, who were codirectors with him in the Marr Oil Corporation.

Early in August, 1923, plaintiff was desirous of selling his stock in the Marr Oil Corporation for cash, and at El Dorado he instructed Rottenberg to proceed to Washington, D. C., where McFadden lived, and that both he and McFadden should go to New York and negotiate with the major oil companies looking toward a sale of the plaintiff's stock for cash. He told them he would permit the other directors to sell their holdings of B stock in the Marr Oil Corporation in the sale on the same basis as his own, i. e., five dollars a share or better. Plaintiff also stated to Rottenberg that in the event he disposed of his controlling interest, he wanted it to go to a large company operated by experienced oil men, which was thoroughly responsible financially.

Rottenberg took with him an audit report of the Marr Oil Corporation as of July 31, 1923, which was a full, detailed and complete report of the Marr Oil Corporation, and also a complete engineers' valuation report. Plaintiff further instructed Rottenberg that when they had reached a point in negotiations where it looked as though a sale could be made, he would come to New York and close the deal himself. The plaintiff did not give McFadden and Rottenberg any authority to close any sale.

On August thirteenth McFadden and Rottenberg went to the office of the Southern States and there met Ferris, who was then president thereof. McFadden stated to him that the purpose of their visit was to interest Southern States in the purchase of Marr Oil Corporation, which controlling interest was owned by the plaintiff. McFadden stated that, in the event that a deal was brought about, he would expect Ferris " would take care of " himself and Rottenberg in the matter.

At this meeting Ferris outlined the Southern States and stated that it was an operating unit and a complete cycle in the oil industry, had built up considerable production, owned thousands of acres of oil lands, had an extensive development and drilling program on foot; that its stock was listed on the New York Curb Market and was selling at twelve to thirteen dollars a share, which price, however, did not reflect its true value which was about thirty-five dollars a share; that it had been paying a dividend of one per cent a month from its net earnings, and that there were sufficient funds on hand for the distribution of a large dividend in the near future. Rottenberg explained that Marr would be interested in selling his class A stock and a portion of the class B stock which he owned, for five dollars a share in cash, and that the other directors who owned some B stock would sell theirs at the same price.

At another meeting the next day (August fourteenth), Ferris stated that they would not consider a purchase of the stock for cash, but would consider an exchange of Southern States stock for Marr Oil Corporation stock, and that he and Haskell had decided that they would give a block of Southern States stock for the Marr Oil Corporation stock, which figured on a basis of seven shares of Marr stock to one share of Southern States. Rottenberg objected to this proposition and said that he would have to submit complete facts as regards Southern States to Marr; that he should be furnished with a detailed financial report showing the status of the company, and Ferris stated that one was in the process of preparation and would be ready within the next two or three days. Plaintiff's case shows that Ferris then told him of the strength of Southern States and that its average net daily production was about 20,000 barrels; that if the deal were put through on the seven to one basis, they would give McFadden and Rottenberg $100,000 and an additional amount of 10,000 shares of stock of Southern States over and above the seven to one ratio of the exchange of stock. Rottenberg made no further objections and then called plaintiff on the long distance telephone at El Dorado and plaintiff stated that he would come to New York.

Haskell and Ferris called a meeting of the board of directors of the Southern States Oil Corporation, and proper officers were authorized, empowered and directed to issue an additional 35,333 shares of stock for the purpose of acquiring the 132,691.5 shares of non-voting stock of the Marr Oil Corporation. The meeting passed a resolution ratifying, confirming and approving a proposed agreement entered into between Ferris and the Marr Oil Corporation. The minutes nowhere contain any mention of $100,000 or any other sum in cash to be paid to any one in the transaction.

Plaintiff avers that when he arrived in New York, Rottenberg and McFadden gave him a glowing account of the Southern States and repeated the representations made to them by Haskell and Ferris. McFadden told plaintiff that he had known Ferris a long time and had been in Congress with him, and that he had every reason to believe that what Ferris told him about the Southern States was true. They also told plaintiff that Southern States would not pay cash, but wished to exchange their stock for plaintiff's stock at a ratio of seven to one. They told Marr that they thought it was a fine trade on that basis.

Plaintiff met Haskell and Ferris and he says they represented to him that the average net daily production of Southern States was 20,000 barrels of oil; that the balance sheet of August 30, 1923, submitted to the plaintiff correctly stated the true condition of Southern States; that leaseholds developed and producing were $10,018,838; that its surplus at that time amounted to $8,416,280.81; that it owned properties valued at $12,000,000; that the Southern States stock was worth $30 to $35 a share; that Southern States had been paying since its incorporation one per cent a month dividend out of net earnings; that Southern States had on hand sufficient cash to pay an extra cash and stock dividend; and that Southern States was a complete cycle in the oil business, which means that it was actually producing and refining oil and distributing refined products.

Plaintiff conferred with McFadden and Rottenberg and told them that he did not think the exchange was fair. McFadden stated to Marr that unless Marr made the trade on that basis, he, McFadden, would throw all the Marr stock overboard and wash his hands of Marr's affairs; and that if Marr did not make the trade on the seven to one basis, he would resign as chairman of the board of the Marr Oil Corporation and be through with Marr and the Marr Oil Corporation. McFadden or Rottenberg never intimated to Marr that they had been promised $100,000 in cash and 10,000 shares of stock for influencing the exchange.

Marr received an audit report as of August 20, 1923, and gave it to McFadden and Rottenberg to take over to Haskell and Ferris. Ferris stated that he noticed that instead of $100,000 in cash on hand, as shown by the July 31, 1923, audit report, Marr Oil Corporation had on hand only $61,000. Ferris told them that he had to cut their secret commission down to $50,000 cash.

Although plaintiff did not favor the deal on an exchange of stock basis, he says he yielded to the pressure brought to bear upon him by his codirectors, the representations made as to the Southern States by Haskell and Ferris, supported by McFadden and Rotten-

beig, and the certificate of good character which they gave to Ferris and Haskell, and he was thus brought to the conclusion that all things considered he should make the trade.

There was an item of indebtedness owing from Marr Oil Corporation to the Ajax Drilling Corporation (100 per cent owned by the plaintiff), which he insisted be paid to him in cash before he would be willing to transfer his control of the Marr Oil Corporation to Southern States. The debt amounted to $75,000. McFadden induced plaintiff to accept 5,769 shares of Southern States instead of $75,000 in cash. This was on a basis of $13 a share for Southern States instead of at $35 or $40.

Ferris then demanded privately of McFadden and Rottenberg that the amount of stock necessary to pay the debt of the Ajax Company be taken out of the extra 10,000 shares, beyond the seven to one basis previously agreed to be given to them, to which they reluctantly consented. The amount of bribery stock to be given by Southern States to McFadden and Rottenberg was thus reduced from 10,000 shares to about 7,000 shares, making a total amount of the bribe $50,000 in cash and 7,000 shares of Southern States stock.

On August 29, 1923, Haskell and Ferris reached an agreement with the plaintiff by which it was agreed that Southern States would exchange with the plaintiff Southern States stock for his A and B Marr Oil Corporation stock, and the other directors were to be allowed to exchange their B stock in the Marr Oil Corporation on the same basis as the plaintiff. The ratio of exchange with Marr and each of the other directors was seven shares of Marr Corporation stock for one share of Southern States. The deal was closed August thirtieth. Ferris presented a typewritten closing statement upon which the exchange of stock was made. Nowhere on this closing statement appears any item of cash to Rottenberg and McFadden, nor any stock to go to them at any other than the seven to one ratio of exchange.

Immediately after the closing on August thirtieth those present went to the New York office of the Marr Oil Corporation and the officers and directors thereof resigned and the nominees of Southern States took office in their stead; an entire new board of directors composed of nominees of Southern States, and new officers, nominees of Southern States, were elected.

On August 15, 1924, receivers were appointed by the Federal court for the Southern District of New York for the Southern States, the Middle States Oil Corporation and the Gulf States Oil and Refining Corporation. No receiver was appointed for Unity Securities Corporation.

The first intimation plaintiff says he had that his agents had been bribed was in May, 1925, from a collector of internal revenue at Little Rock, Ark. The plaintiff thereupon proceeded to New York and visited the office of the Southern States and found that neither Haskell nor Ferris was there. He then called upon Miss Keefe, former secretary of Haskell since 1917. She was also secretary of Unity in 1923, and treasurer in 1924. Miss Keefe produced the checks that went to pay McFadden and Rottenberg from some Unity papers in storage there.

The fact that his agents had been bribed led the plaintiff to believe that misrepresentations had been made to him as to the Southern States, and he thereupon petitioned the Federal court, under whose jurisdiction the receivers were appointed, for leave to sue the receivers, which petition was presented on August 4, 1925. He thereupon brought this action.

Plaintiff on the trial proved that all of the representations alleged to have been made to him by the Southern States were false and fraudulent. He tendered back 21,882 shares of stock of the Southern States Oil Corporation, and not the 28,296 shares transferred by defendant in the exchange. Many of these certificates were dated in 1926 and 1927, indicating that plaintiff had sold the original stock and repurchased much of it after the action was begun, and long after a great depreciation of the stock from $33 to a few dollars a share, which occurred about December 26, 1923. Plaintiff also tendered at the trial $8,752.80 as the amount of four dividends received on said 21,882 shares, with interest on said dividends. It appears that on December 6, 1923, plaintiff returned to defendants by way of sale to them 2,890 shares of Southern States stock, and defendant paid to plaintiff therefor $23 per share, amounting to $66,470 in cash. The plaintiff does not tender or offer to return the profits made on these shares, for which he received this $66,470 in cash.

We think that the plaintiff's failure to tender or offer to tender back the profits made on these shares defeats his claim to a complete rescission of the contract between him and the Southern States Company. The basic theory of rescission is complete surrender of every advantage received under the contract. These transfers and this sale cannot be separated and considered as each embodying its own trade. Nor can the repurchase out of which $66,470 was received be regarded as a distinct transaction between the parties.

The following quotation from an early precedent still states the law: " Here there has never been, either before the commencement of this suit, or in the complaint, or at any stage of the litigation, an offer of restoration by the plaintiff, and there was not even any

proof of his financial ability or of his willingness to make the restoration. Therefore, even if the fraud had been proved as alleged in the complaint, there could have been no recovery." (*Graham* v. *Meyer*, 99 N. Y. 611, 615.)

For the reason that complete rescission and full tender were not made, no equitable cause was furnished for relief.

The judgment should, therefore, be reversed, with costs, and the complaint dismissed, with costs.

DOWLING, P. J., FINCH, MARTIN and PROSKAUER, JJ., concur.

Judgment reversed, with costs, and the complaint dimissed, with costs. The findings inconsistent with this determination should be reversed and such new findings made of facts proved upon the trial as are necessary to sustain the judgment hereby awarded. Settle order on notice.